FTB:PP/EWS
F. #2022R00606

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ERLENE KING,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. 24-374 (CBA)
(T. 18, U.S.C., §§ 981(a)(1)(C), 1343, 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.  New York City's Public Matching Funds Program

1.  The New York City Campaign Finance Board ("CFB") oversaw and administered a publicly funded campaign finance system in connection with municipal elections in New York City that included, among other things, a "matching funds program" that provided eligible candidates with public funds based on the number and amount of certain donor contributions.

2.  Candidates running for municipal office in New York City, including the Office of the Brooklyn Borough President, were eligible to participate in the CFB's matching funds program if they met certain criteria. Among other things, to be eligible to receive public funds, candidates were required to meet a two-part fundraising threshold. Specifically, a candidate had to collect a minimum number of donations and

raise a minimum amount of money from New York City residents before the CFB paid any matching funds.

3. If candidates met the eligibility criteria, they received different amounts of matching funds based on the kinds of contributions they received. For candidates who ran for the Office of the Brooklyn Borough President during the 2021 election cycle, candidates received up to $8 in matching funds for each $1 of eligible contributions, up to $175 per contributor. In other words, if a candidate received an eligible contribution of $175, a candidate for the Office of the Brooklyn Borough President could collect up to $1,400 in matching funds. However, certain kinds of contributions (such as cash contributions) were subject to additional limitations. In total, the matching funds program provided up to $1,457,777 in public matching funds to a candidate for the Office of the Brooklyn Borough President. Because campaigns for Brooklyn Borough President during the 2021 election cycle needed to raise at least $50,000 in eligible contributions to receive any matching funds, any candidate who was eligible to receive matching funds from the CFB necessarily received at least $400,000 in matching funds from the CFB.

4. Some contributions that otherwise could be accepted by political campaigns were not eligible to be matched, including contributions from non-New York City residents; contributions from or arranged by individuals doing business with New York City; and contributions from one-time employees or vendors of a candidate's own campaign.

5. Among other requirements, candidates seeking matching funds were required to file electronically disclosure statements with the CFB by specified

deadlines. A campaign seeking matching funds was required, for each donation made by cash or money order and represented to be eligible for such funds, to provide the CFB with a campaign contribution form containing the contributor's name, address, employment information, and amount donated. That form was required to be signed by the contributor, who was required to acknowledge that the listed contribution was made in the contributor's name, from the contributor's funds, and that the contributor would not be reimbursed for contributing. For contributions made by check or credit card, a campaign was permitted to obtain contribution cards as backup documentation for matching claims or else was required to provide CFB with copies of the checks or credit-card proof of processing, respectively.

6. Certain kinds of contributions were prohibited entirely, including, among other things, "nominee contributions," in which money was given to a campaign under a contributor's name but, in reality, the money for that contribution came from, or was reimbursed by, another person or entity. The CFB informed candidates, in substance and in part, that "[n]ominee contributors are also referred to as straw donors, and these types of contributions are not only prohibited but also illegal."

II. <u>The Scheme to Defraud the Public Matching Funds Program</u>

7. On October 22, 2020, a candidate running in a primary for the Office of the Brooklyn Borough President whose identity is known to the United States Attorney ("Candidate #1") filed a certification with the CFB declaring Candidate #1's candidacy. As part of that certification, Candidate #1 indicated, among other things, that Candidate #1 wished to participate in the CFB's matching funds program.

8. The defendant ERLENE KING served as the campaign treasurer for Candidate #1's campaign for the Office of the Brooklyn Borough President (the "Campaign").

On Candidate #1's certification submitted to the CFB, KING certified that she understood that she was prohibited from causing the Campaign to submit fraudulent matchable contribution claims and/or false information to the CFB.

9. Between October 2020 and April 2022, the defendant ERLENE KING, together with others, conspired to obtain fraudulent contributions for Candidate #1 for the purpose of, among other things, defrauding the CFB's matching funds program. A number of those contributions, which were obtained at KING's direction, were fraudulent nominee contributions made in the names of individuals who did not personally fund the contributions or were reimbursed for them (i.e., straw donors). Other fraudulent contributions were made in the names of individuals whose identities were stolen and who had not personally contributed to the Campaign.

10. The defendant ERLENE KING used electronic payment platforms to finance many of the nominee contributions and directed intermediaries to disburse the funds to straw donors. For example, on May 11, 2021, KING paid $1,110 to an individual whose identity is known to the United States Attorney ("Individual #1") via CashApp, an electronic payment platform, writing "6" in the subject line. Hours later, Individual #1 sent $540 via CashApp to another individual and wrote, "Contribute to [Candidate #1] for me 175x3 ppl 180 each." The following day, the recipient of the funds from Individual #1 donated $175 to the Campaign.

11. As another example, on May 14, 2021, the defendant ERLENE KING paid $1,110 to Individual #1 via CashApp. Hours later, Individual #1 paid $180 to another individual and wrote, "donate 175 for me to TY." Approximately one hour later, the recipient of the funds from Individual #1 donated $175 to the Campaign.

12. On June 23, 2021, the defendant ERLENE KING paid Individual #1 $1,500 via CashApp. The following day, Individual #1 paid six individuals via CashApp a total of $1,110. Individual #1 wrote to four of the recipients, "donate $150 for me TY." Individual #1 wrote to one recipient, "donate $175 for me TY"; and Individual #1 told another recipient, "donate 150x2." Later that day, the recipients of the funds from Individual #1 donated to the Campaign in accordance with Individual #1's instructions.

13. On June 26, 2021, the defendant ERLENE KING paid $1,000 via CashApp to another individual whose identity is known to the United States Attorney ("Individual #2"). Later that day, Individual #2 paid three individuals via CashApp a total of $700. Individual #2 wrote to one of the recipients of the funds, "175 per person." The Campaign then received $700 total from three donors. Two of the contributors were direct recipients of the funds from Individual #2, while the third contributor received the funds through another individual who acted as an intermediary with Individual #2.

14. Three days later, Individual #2 sent an Instagram message to another prospective contributor, writing, "I need to contribute to this guy's election but since [I] don't live in [Brooklyn] I can't directly contribute. So I'm giving my [Brooklyn] friend the money to donate for me. If [I] can give you 175 to donate to his campaign that would help me out a lot[.]" Individual #2 then specified that the candidate was "[Candidate #1] for borough president" and asked the prospective contributor for his or her CashApp information. The following day, Individual #2 paid the prospective donor $175 via CashApp, who then donated the money to the Campaign.

15. Ultimately, the defendant ERLENE KING and her co-conspirators caused the Campaign to submit at least $25,000 in straw donations, along with corresponding

fictitious records, in an effort to meet the CFB's thresholds for receiving public matching funds and to defraud the CFB of at least $400,000 in public matching funds.

16. The CFB sought additional information to ensure the legitimacy of the contributions. In response, the defendant ERLENE KING and her co-conspirators caused the Campaign to submit additional fictitious information to the CFB, including forged affirmation letters that falsely attested that the listed donors contributed to the Campaign. KING directed a Campaign staffer, whose identity is known to the United States Attorney ("Staffer #1"), to provide her with personal identifying information for individuals who had not donated to the Campaign and caused the Campaign to submit fictitious paperwork attesting that those donors contributed to the Campaign. KING then caused Staffer #1 to falsely notarize fictitious affirmation letters attesting that the individuals contributed to the Campaign.

17. The CFB ultimately determined that the Campaign submitted fictitious records and did not pay any public matching funds to the Campaign.

## WIRE FRAUD

18. The allegations contained in paragraphs one through 17 are realleged and incorporated as if fully set forth in this paragraph.

19. In or about and between October 2020 and April 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ERLENE KING, together with others, did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud one or more persons, and to obtain money and property from such persons by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did

transmit and cause to be transmitted, by means of wire communication in interstate commerce, one or more writings, signs, signals, pictures and sounds, to wit: CashApp transactions.

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

20. The United States hereby gives notice to the defendant that, upon her conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

21. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

*By Carolyn Pokorny, Assistant U.S. Attorney*
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK