UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA,

       -against-                                       24 CR 374 (CBA)

ERLENE KING,
                     Defendant.

-------------------------------------------------------X

## DEFENDANT'S SENTENCING MEMORANDUM

**JOHN S. WALLENSTEIN, ESQ.**
**Attorney for Defendant**
1100 Franklin Avenue
Garden City, New York 11530
(516) 742-5600
Fax: (516) 742-5040
Email: JSWallensteinEsq@outlook.com

This memorandum is respectfully submitted on behalf of Erlene King, in connection with her sentencing for her conviction, by guilty plea, of Wire Fraud, 18 U.S.C.§ 1343. For the reasons set forth herein, we respectfully suggest that the appropriate sentence is a period of probation, with appropriate conditions.

**SENTENCING GUIDELINES ISSUES**

The PSR correctly calculates the Sentencing Guidelines, and that calculation is also reflected in the Plea Agreement entered into by Ms. King. That calculation was stipulated in the Plea Agreement. The total offense level is 20, Ms. King is in Criminal History Category I, with no prior convictions, and the guideline range is thus 33-41 months.

However, a sentence within the guideline range would be far greater than necessary, after considering all of the factors of 18 U.S.C.§ 3553(a), as described below.

**SENTENCING FACTORS**

The Court is, of course, fully familiar with the factors to be applied to sentencing under 18 U.S.C.§ 3553(a). While all are important, and must be considered, we suggest that the most significant of the factors, given the circumstances here, is the history and personal characteristics of Erlene King.

**NATURE & CIRCUMSTANCES OF THE OFFENSE**

This non-violent fraud offense did not result in a loss. The scheme was intended to obtain public funds, available to candidates for public office who raise money from individual donors. In this instance, the Campaign Finance Board of the City determined that the campaign was not entitled to those funds, and no money was provided to the campaign.

The fact that the plan was a failure does not excuse the conduct, of course, but the fact that there was no actual loss is something that the Court may consider.

While Ms. King acted as the campaign treasurer, she did not benefit from the scheme; if anything, by her arrest and prosecution she has suffered more than the one person, the candidate himself, who would have reaped rewards from the matching funds had the City provided them. There was no personal benefit to her, as all the funds raised went into the campaign accounts and were used for campaign purposes, including payment to campaign workers. This scheme was a fool's errand from the beginning, as the Campaign Finance Board scrutinizes financial issues closely.

Nonetheless, Ms. King did participate in the scheme, and receives a managerial adjustment to the guidelines because she was the treasurer, and thus responsible for the proper handling of funds and the accuracy of the campaign records. She has admitted her guilt.

## **HISTORY & CHARACTERISTICS OF ERLENE KING**

We respectfully submit that in this unique case, the most significant of the factors the Court must consider is Erlene King's own history and characteristics. Never before this did she have any involvement with the criminal justice system. Her participation in this scheme is truly aberrational. She has led a long and difficult life. The PSR details multiple domestic partners, some of whom she married, and four children, only one of whom survives. She lost three children while each was a teenager, one to accidental drowning and two to violence, a stabbing and a shooting. PSR ¶¶50-53. These traumatic and devastating events have had a major impact on her life, no doubt contributing to the stress and mental health issues from which she suffers.

The PSR is quite thorough, and accurately describes Erlene's life, as well her trials and tribulations. The letter from her granddaughter Crystal Nobrega, the relative closest to her, describes the decline of Ms. King's life after the title to her home was stolen and she was forced to leave. (See also PSR ¶55)

Ms. King's mental and emotional health is a major factor in her life, and is well documented in the PSR, ¶¶62-65. ███████████████████████████
███████████████████████████████████████████████████████████



She is currently in therapy, mandated through PreTrial Services, and will need ongoing therapy after sentencing. But, reality in the Bureau of Prisons (discussed in detail *infra*) is that if she is incarcerated she will not receive the necessary treatment ███████████████████████████████████████████████████████████████████████ by the stressful nature of prison life. For a 72 year old woman with these issues, that situation would be devastating, and likely something from which she would not recover.

Ms. King is a foster parent to two 16 year old boys, and her main source of income is the foster care system. If she is incarcerated, those boys would be uprooted from their home, and Ms. King would have no way to reinstate that situation upon release. With this felony conviction, finding housing is extremely difficult, and she might well find herself homeless and without income if she is incarcerated even for a short time.

**NEED FOR THE SENTENCE TO BE IMPOSED**

One of the primary reasons that the Court is afforded discretion in sentencing, and that the guidelines are advisory, is that the Court can exercise that discretion in a way that accounts for all of the factors to be considered, without overemphasizing punishment or any other factor. In *Pepper v. United States*, 131 S. Ct. 1229 (2011), the Supreme Court reaffirmed that the cornerstone of federal sentencing is that the sentencing judge "consider every convicted person as an individual and every case as

a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Id. at 1239-40 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). That process is embodied in the advisory sentencing system instituted by the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which "breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the § 3553(a) factors to the criminal defendants that come before them." *United States v. Jones*, 531 F.3d 163, 170-71 (2d Cir. 2008) (district court must make an "individualized assessment" of the sentence warranted by § 3553(a) "based on the facts presented" and "may not presume that the Guidelines range is reasonable") (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)); see also *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*) ("A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime").

Prison is punishment, obviously, and different people endure incarceration in different ways. Prison for Erlene King, at 72 years of age and in poor health, both physically and mentally, would be a horrendous experience, essentially cruel and unusual punishment, given her unique circumstances. Society will not benefit from locking her up; she is no danger to others, and will never have the opportunity (never mind the inclination) to commit a crime again. Under the circumstances, prison is not the solution, and the Court should not be tempted to simply punish her by such a sentence.

For Erlene King, the mere fact of her arrest and prosecution, and now a felony conviction, are punishment enough. A period of probation, with the restrictions on ordinary liberty which that entails, will be sufficient, but not greater than necessary, to achieve the aims of sentencing and to punish Ms. King. Such a sentence will be beneficial to her as well, because the Probation Service has the resources to assist her, by directing referrals to appropriate health care providers, among others.

5

Since her arrest in this case, Ms. King has been under the supervision of PreTrial Services, and has been fully compliant with all the conditions of her release (see PSR ¶ 2). Her compliance supports the position that she will be amenable to the supervision of the Probation Service, and that the Court can trust her to be a law-abiding citizen and abide by the restrictions imposed.

**A PRISON SENTENCE IS GREATER THAN NECESSARY**

Because Ms. King suffers from a plethora of physical and mental health issues, if she is incarcerated she will need regular medical care. Although the Bureau of Prisons professes to meet the needs of inmates with respect to medical issues, experience shows that their treatment is sporadic and inadequate. *Cf. United States v. Colucci,* 743 F. Supp. 3rd 452 (EDNY, 2024) This Court is thoroughly familiar with the conditions at MDC, and other institutions have similar issues.

Conditions in the BOP facilities nationwide, and at MDC in particular, are horrendous, and have not only shown no signs of improvement in the past few years, but have actually deteriorated. This is due, in large part, to severe understaffing, which results in inmates being deprived of mandated programming, needed medical care, and even the simple amenity of visits and phone calls. A recent article in ProPublica documents some of the problems in the BOP.[1] According to the article, the Bureau of Prisons lost 1400 more staff members than it hired in 2025. "Fewer corrections officers means more lockdowns, less programming and fewer health care services for inmates…. Prison teachers and medical staff are being forced to step in as corrections officers on a regular basis." As the article notes, BOP officers, underpaid and overworked to begin with, are being "poached" by Immigration & Customs Enforcement (ICE), whose budget has been substantially increased and

---

[1] Keri Blakinger, "We're Broken: As Federal Prisons Run Low on Food and Toilet Paper, Corrections Officers are Leaving in Droves for ICE". *www.propublica.org/article/ice-bop-federal-prisons-corrections-officers,* (last visited November 30, 2025)

which is now offering $50,000 signing bonuses plus tuition reimbursements, in addition to higher salaries, to correction officers who switch agencies. Since the bonus alone is more than the starting salary for correctional officers, is it any wonder that BOP cannot retain qualified people? The end result, of course, is that federal prisons are very dangerous and inhumane places, where prisoners are simply warehoused. For a fragile woman of Ms. King's age, that situation can be life-threatening.

In *United States v. Chavez,* 710 F. Supp. 3rd 227 (SDNY, 2024), Judge Furman, discussing the same issue specifically as it applied to MDC, noted that "Any first-year economics student would know that the primary way to improve the situation is to raise salaries and improve working conditions. **But there is no reason to believe that the political branches are likely to do either any time soon.**" (emphasis added). That was written in January, 2024; if anything, the conditions in the BOP have worsened in the past two years, and the fiscal situation is now disastrous; witness the recent government shutdown and the possibility that January 30, 2026 will see another. And, as anyone reading a newspaper knows, Congress is hopelessly dysfunctional and incapable of solving this problem.

Judge Furman considered the issue in the context of an application for release pending sentencing, concluding that "unique circumstances" favored release, which included the fact that the defendant posed no risk of flight or danger, and was of "advanced age and serious medical conditions which require care that the MDC may not be able to provide." *Chavez, supra.* @ 238. The same is true of Ms. King.

Here, in the context of sentencing itself, the conditions which are so prevalent at MDC have spread to other BOP facilities. As the ProPublica article emphasizes, the shortstaffing at most BOP facilities means that inmates are not receiving medical care and programming to which they are entitled. Incarceration under these conditions, in any facility run by the BOP, amounts to cruel and unusual punishment for Erlene King, given ███████████████████████ health issues. She will simply be unable to cope under the conditions which exist, and which show no sign of abatement.

7

We recognize that probation recommends a short period of incarceration, but we respectfully suggest that even a few months is unnecessary, and may be seriously detrimental to Ms. Kings' physical and mental well-being, given her condition and her age.

**DETERRENCE**

One of the primary objectives of sentencing is to deter future criminality, both from the sentenced defendant and those who might otherwise be inclined to commit crimes. In this case, Erlene King is certain not to recidivate. Not only is she incapable of doing so (she would not be hired by a political campaign after this conviction), but her physical and mental capacity is such that she cannot engage in any similar conduct. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

This felony conviction has turned her life inside out. She is concerned that she will lose her home and her source of income if she is incarcerated. She will never again see the inside of a courtroom.

**THE NEED FOR THE SENTENCE IMPOSED**

What Erlene needs is help. ████████████████████████ Medical intervention for her myriad physical problems. A sentence to probation will help provide the resources she cannot provide for herself, to deal with her issues. A prison sentence, especially under present conditions, would be far greater than necessary to achieve the aims of sentencing. She has demonstrated, by her full compliance with the conditions of release imposed in this case, that she can be trusted to follow the direction of the Court and Probation. If the Court feels the need to impose a greater restriction on her liberty than probation, we respectfully submit that a period of home detention, with the ability to leave for specified activities such as medical and therapeutic appointments, would suffice.

## CONCLUSION

For all the reasons noted herein, we respectfully suggest that the appropriate sentence for Erlene King is probation, with conditions as noted in the PSR, and continued mental health treatment. She is not in a position to pay a fine.

DATED:     GARDEN CITY, NEW YORK
                December 4, 2025

Respectfully submitted,

*John S. Wallenstein*
JOHN S. WALLENSTEIN

Crystal Nobrega
Houston TX. 77015
October 6th, 2025

Honorable Judge Carol Bagley Amon
United States District Cadman Plaza East,
Brooklyn, NY 11201

Re: Leniency
Case Number: 1:24cr00374-1

Dear Honorable Judge Amon,

I am writing this letter on behalf of my Grandmother Erlene King, who is currently involved in a serious legal matter before you. My name is Crystal Nobrega and I have been very close to my Grandmother for my entire 35 years. Being close to my Grandmother allowed me to witnessed both her Private and professional journey. Throughout the years I have watched my Grandmother deal with personal tragedies with integrity, compassion and responsibility. Her commitment to family values and her dedication to helping others have been evident in every aspect of her life. She always found the time to selflessly devote herself to the service of others.

My grandmother served as Director of Community Affairs at New World Creations Resource Center Inc., where she coordinated the "AIDS Walk Caribbean to raise money to create an AIDS vaccine. She created and was a Standing Member of Camba Beacon after school program advisory board at Public School 269, where High School kids were allowed to stay safely until 8:30pm. She also founded and for two years presided over the auxiliary of Kings County hospital Center's nursing home, "The Dr. Susan Smith McKinney Nursing and Rehabilitation center," there she worked closely with the seniors and formally homeless residents.

One of my Grandmother's greatest qualities was her ability to face challenges with courage and resilience. However, after her home was stolen, she was so devastated that she lost her memory and was placed on medication. My Grandmother has not been the same since. My opinion is that her refusal to accept her damage mental health has caused the legal problem she is in today.
Please, Judge Amon, have compassion on my sick Grandmother.

With great appreciation and respect,

*Crystal Nobrega*
Crystal Nobrega

Thank you

Judy D. Newton, EdD
███████ ██ ███
Brooklyn, NY 11236
Email: phd58@msmn.com
Phone: (917) 439-7742

October 7, 2025

Honorable Judge Carol Bagley Amon
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Bagley Amon,

I am writing this letter on behalf of my friend Erlene King who resides at ████████████, ████████████████. I have known Erlene since the fall of 2021, and have known her to be a good, caring, and community helper. If anyone in the community has a problem whether it be acquiring food from a pantry or service organization, assistance with their bills, or cutting through governmental red tape, she is there to lend a hand and offer the appropriate advice/assistance. Erlene is not only a champion of those in need socially, she has housed and cared for undomiciled and foster care individuals as though they were her very own children and relatives.

It disturbs me that Erlene is in such a precarious bottle neck within the judicial federal system. As a decorated, NYPD Detective who has served this city for approximately 28 years, I understand and have seen individuals who have been charged with all kinds of crimes under a plethora of state and federal statutes for various and unexplained reasons.

Judge Bagley Amon, I urge you, and I am pleading that given Erlene's age, mental health issues, her vast community service rendered to public service, she be granted a period of supervised probation. Thanks for your attention to this matter.

With kind regards, respectfully

Judy D. Newton EdD.